2-17-0478 requires the transportation of the State of Illinois board and non-capital people of the State of Illinois plaintiff-appellant to the various defendants including 1771 West Diehl Rd. defendants-appellees. Argument on behalf of the plaintiff-appellant, Ms. Antonia S. Pritchard. Argument on behalf of the defendants-appellees, Mr. Peter G. Hawkins. Good morning, all. Ms. Pritchard? May it please the Court, Counsel. Good morning, Your Honors. My name is Antonia Pritchard and I represent the plaintiff, the Illinois Department of Transportation, the appellant in this case. This is an eminent domain proceeding that began in 2012 arising out of IADT's project to improve Route 59 in Naperville and Aurora. The property in issue is located at the northwest corner of Diehl Rd. and Route 59 in Naperville. The issues that I'm going to talk to you about today are, number one, the circuit court's failure to find a common law dedication, and that would be issue number one in our brief. Number two, the circuit court's error in allowing SF3's appraiser, Pat McGar, to testify to her opinion of damages that did not mitigate damages, and that would be issue number three in our brief. Number three, the circuit court's error in refusing IADT's requested Illinois Pattern Instruction 33.02 on the duty to mitigate damages, which is issue number five in our brief. And number four, the circuit court's error in refusing to sanction SF3 for its discovery violation, which is issue number four in our brief. With respect to the remaining issues in our brief, unless the court has questions on those issues, we will stand on the arguments in the brief. The standard overview for determining whether or not a common law dedication exists for this court is de novo, and that's because the determination can be made based on the undisputed documents in the record. A common law dedication occurs when there's unequivocal evidence of intent to donate land to the public use and acceptance. But wasn't that really the issue, whether there was donative intent? That's correct, Your Honor. In this case, the circuit court found there was insufficient evidence of donative intent because the court found that the words that were on the plaque, hereby dedicated for road purposes, were ambiguous as to what the dedication was in reference to. Our position is that that was an error because the intent for a common law dedication is the intent to set aside the land for the public's use. A common law dedication creates a perpetual easement in the land for the public's use, and therefore, it does not require a grantee to be in existence at the time of the dedication. Unlike a statutory dedication. But we have to know what that area is and that it has been accepted, correct? Excuse me. That's correct. And the dedication in this case was made to be used for road purposes, so it was to the public for the public to use for road purposes. And we believe that there was acceptance in this case. How was there acceptance? There was acceptance in this case when Neighborville passed the variance that recognized the land dedicated to be public. Without the variance, the dedication was not needed because the parking garage that was getting approved at that time, the proposed location, was shown to be outside the required sector. So there was no need to pass the variance if there was not a dedication. In addition, when Neighborville approved the variance, excuse me, when Neighborville approved the plot of subdivision, it did so pursuant to its code, which provides that Neighborville approves plots that are unsigned, because the code requires the property owner to take the approved plot and get it signed and returned to Neighborville so it can be recorded. And so Neighborville approves the plot of subdivision and grants the variance, which is the acceptance, with the full expectation that the property owners would take the steps they were legally required to do, return the plot signed so it can be recorded. This subdivision was built, however, wasn't it? This was a preexisting, it was not a subdivision. It had never been subdivided. All right, well, this development was accomplished. Yes, there were two buildings located on this property. They had two separate addresses. But the property did not comply with Neighborville's subdivision code, which provided that if four or two buildings could be on one track of land or one lot, the property had to be properly subdivided. And this property had never been properly subdivided. What happened to the plot that was supposed to attach itself or was attached to this development? Did it ever get recorded? No, it did not. In fact, in December of 2015, when it came to Neighborville's attention that it had not been recorded, the zoning enforcement officer sent a letter to SF3, who is the current property owner, advising them that the plot still needed to be recorded and that until it was recorded, the property will remain illegal under a Neighborville subdivision ordinance. Has it ever been recorded? Not to my knowledge, it has not been recorded yet. And so the property remains illegal with illegal lots of record pursuant to Neighborville's subdivision code. Well, then how can we ultimately say that it was accepted by the public if it's illegal? The property may be illegal under Neighborville's subdivision code, but the common law dedication was accepted by Neighborville when they granted the variance that recognized the land as dedicated. That's all that is needed for acceptance. And you can have acceptance. You can have a common law dedication, the intent and the acceptance, and not have it granteed because the grantee is the public, and the public is an ever-existing grantee that's capable of taking and using a dedication for public use. This is kind of like the Woodward v. Schultz case where the property owner subdivided his land and he had a lot that he named Lot 342, and at the same time he had a separate document, a piece of paper that was a map, and on the map he indicated that that lot was going to be a park. And the park district that ultimately maintained the park and took care of the park wasn't even in existence at that point. But the court found that there was clear intent that the property owner wanted to dedicate that Lot 342 to be a park, to be for the public, even though the ultimate grantee of the park district didn't come into existence for several years. That did not negate the fact that there was still a common law dedication for the public's use. And that's what we had in this case. In fact, had the property owners done what they were legally supposed to do under Neighborville's Code, we would have had a statutory dedication, which then would have transferred the field title to the land that was dedicated.  And sometimes the statute is not fully compliable, in which case courts have found common law dedications. And that was the case in the Rehman v. Kale case that we cite, where there was a statute, but the signatures on the certificate were not proper. They were found to be not proper for – fully proper for a statutory dedication. And the court said, well, that's fine, we'll have a common law dedication here. And they found the common law dedication when it failed as a statutory dedication. You said the ordinance that was passed did not recognize the dedication, correct? Well, the ordinance did not refer to the dedication, but it incorporated the plot of subdivision. There was no – the ordinance merely passed – the purpose of the ordinance was to pass the variance and approve the plot of subdivision, and then it gave approval for the garage. Well, the petition for the ordinance, the petition for the approval of the plot and the variance, didn't mention anything about a dedication, correct? No, the petition in 2008 also did not mention the variance either. So the petition was in 2008. The ordinance wasn't until 2010. So there was negotiations presumably between Naperville and the property owner because the property owner wanted to build a parking garage on the 1751 property. I understand that. But where – okay, you're talking about non-negotiations. We're shifting into that. Where is there evidence that the negotiations referred to a dedication? We don't have evidence that shows that. But, Your Honor, the plots on its face – all that's required for a dedication is for the plot on its face to show the intent to dedicate. And we have – the words that were used in the plot here have legal effect. They have legal meaning. They've been construed by the courts of this state to show the intent to dedicate, to make a common-law dedication. We have the words here by dedicate, which are the Republic Bank versus Village of Manhattan, show the intent to make a dedication. And then we also have the words for legal purposes. But wait, was Republic Bank a statutory – Pardon? Republic Bank was a statutory dedication case, correct? Yes, it was a statutory dedication case. Okay, so now we're talking about a common-law dedication. We're all clear on that. And evidence of intent has to be shown clearly and unambiguously. Let me ask you this. When, in fact, this whole variance issue came up, your argument is that Keystone Group – I think it was Keystone Group at the time – was going to dedicate land in order to then put them in violation of the city ordinance that they then had to get a variance for? Keystone was dedicating land because I not – I'm – pardon me. Keystone was dedicating land because the parking garage was going to increase the number of parking spaces on the 1751 property by more than 50 percent. And so Naperville had the right – and that would be under the Kubok case that we cite – to require either a contribution of land or money because it foresaw the increased burden on the roadway. Well, I thought the variance was because of a 20-foot setoff. Well, so what the variance was for was because Naperville has a required setback to 59, which is 20 feet. So that's my question. As the roadway existed before the I-DOT taking, that parking garage would have been in compliance with the 20-foot setback. That's correct, Your Honor. It was well – it was well – it was about 30 feet. So my question now is why would a company donate land in order to then put themselves in violation of an ordinance that they then would have to seek a variance to put a building up that they wanted to desperately put up? Well, we don't know if that – we don't know if that's the case. What we do know is that there's a dedication on the plot and there's a variance at the same time. And the variance – the variance keeps the property legal with the dedication. So they – what we have – what we have is the plot with the clear language of intent. We have the variance, which keeps the parking garage legal with the dedication. So it was all part of the same proceedings. And at the end of that proceeding, the parking garage is on the property. It's as large as the property owners wanted. The property is dedicated and the parking garage is legal because it has a variance. And if I'm petitioning – if I'm making this petition on behalf of Keystone and I'm writing it up and I'm asking for a variance, I'm for sure putting in that petition, hey, guess what? I just gave you guys a bunch of land. Please give me a variance. Wouldn't you logically put that in the petition to let everybody who's on that Zoning Board of Appeals know or Zoning Commission know that you're seeking this, that you've done something good, and now you're asking for something in return? Well, when they filed the petition in 2008, they didn't ask for a variance. The variance came up later. And so the variance was part and parcel of the whole proceeding, which was to allow the property owner to get the parking garage the size they wanted, where they wanted. And the variance in exchange, Naperville was able to get the dedication because it foresaw an increased burden on the roadway and that it was likely going to have to change the roads. And so at the end of the proceedings, the property owners got the parking garage that added more than 50 percent to parking, and they got the variance, which kept their property legal. So there would be no need for them to go back in and get another variance. Everything was taken care of in one proceeding. So the variance was not so that the parking lot was within the 20-foot setback. You're saying that the variance was because of the size of the parking lot. I was saying that without the dedication, there was no need for a variance. The parking garage was a little over 30 feet from the property line. With the dedication, then it would be less than 20 feet to Route 59, which then would not satisfy the major arterial setback, and they would require a variance. And why would I do that is the question. Here's my land. Here's my parking lot. I'm in compliance. Why would I give away land that would then take me out of compliance? Well, we don't know, Your Honor. What we know is what the plat says. I understand that. The plat that was never recorded. Correct, but the property owners were legally obligated to record it, and they did not record it. And the plat still contains the words that show the intent for a common-law dedication, and there was acceptance of the dedication. So under the law, we have everything we need for a common-law dedication in this case. If we accept all of your steps along the way as to what must have been happening. Well, Your Honor, if we just look at the words on the plat, because those words have legal meaning and they need to be given that legal meaning, the intent of the authors in using those words is irrelevant. Those words, the circuit court was required to give the words legal meaning, which showed that it establishes as a matter of law the intent for a common-law dedication. And that's what the circuit court didn't do here. The property owner's intent at the time was irrelevant because these words on the plat had legal meaning, and the court was bound to give these words legal meaning and find that there was intent for common-law dedication. That's where the circuit court erred here. I think you're conflating a statutory and a common-law dedication. I mean, a statutory dedication, we have to give legal meaning to what's stated on there. If that had been filed, then I certainly understand your argument. It was never filed. So we have to look behind those words. Or we can't, we don't have to, but we can look behind those words. You're saying that it's basically strict liability. You put that in the plat no matter what. The plat could then go in someone's garage for 20 years. You've dedicated the property. Your Honor, this would be similar to the Cooney v. City of DeKalb case and the Kennedy v. Town of Normal case. These are cases where you can have a plat that you can find the intent to donate from the face of the plat. I mean, a common-law dedication doesn't even need to be in writing. It doesn't need to be recorded. It doesn't need to be signed. If you have words on a plat that have the words alone show the intent to dedicate, that's all you need for a common dedication. At the time the plat was drafted, at that time, everybody knew IDOT was taking this land or wanted to take this land, correct? Well, I believe that there was an anticipated project, whether or not the funding was going to come through and the project was going to actually happen. I mean, that can always be an unknown. This was in 2010. IDOT's offer wasn't made until 2011. So at this point, yeah, I think people did expect that Route 59 was going to be widened. But the fact that Naperville accepted a dedication because it had to improve the roadway— I'm not talking about that. I'm talking about the intent of the drafters of the plat. If at the time this plat's drafted, the drafters know that this land is going to be taken to expand on the roadway, then the trial judge looked at that and said, it could be referring to that. It could be referring to IDOT's taking in the future. And that's why you're coming in, because you know this is coming, and you still want to build your parking garage, and your parking garage is going to be a nonconforming use. Well, at that point in time, it would still be a dedication for public use. And there's nothing in the plat that says the property owners were setting this aside for a future project. But there's nothing in the record to prove the contrary, that they're just putting it on a plat to show where the roadway's going to be after the IDOT taking. So now I've got to get a variance because I want to put this building in, and I don't want it to be a nonconforming use. And we have letters from Naperville from 2010 talking about the Illinois Route 59 expansion project. Everybody knew about it. Well, everyone knew it was anticipated to come. That's correct, Your Honor. But the fact is, they did not put on the plat that this was set aside, they were reserving it. They expressly used the words, hereby dedicated. And those words are words of dedication. And they put those words on the plat, and then they went through the proceedings with Naperville to get the approval for the variance. I'm sorry, the approval for the parking garage. They got all those approvals, and then they did not take the steps that they were legally required to do. I mean, at a minimum, the property owners should be stopped from denying the intent to take the intent to dedicate because they got the benefit of what they led Naperville to give them, all these approvals, by Naperville thinking they were going to get the statutory dedication, which they didn't get. And then the property owners get their, they get everything, and they have all their approvals, they build their parking garage, and then they don't take the steps that they're legally required to do. So they got the benefit of their actions and their wording on the plat, but they didn't take, you know, they didn't fulfill their end of the deal, their end of the bargain, which was to get that plat recorded. I mean, I don't know that there's any doubt that they intended to dedicate that land because they engaged a land surveyor. They were very specific about the land that was delineated to be dedicated on the plat to the inch, and they used the words for both purposes. When you use words that have legal meaning, you are bound to that meaning, and it's a mistake of law if you think those words don't mean what they mean. And under the Broadwell case and the Tilton case that we cite in our brief, when you use words that have legal meaning, you're bound by that meaning, even if you don't understand them or you're mistaken. I mean, that's a mistake of law, and there's no excuse for that. All right. Counsel, you'll have an opportunity to reply after their opportunity to speak. Thank you, Your Honor. Mr. Hawkins. Good morning, Your Honors. May it please the Court, my name is Peter Hawkins, and I represent the property owner, Defendant Appellee SF3 West Deal LLC. Your Honors, my client comes before you. When did those words go on that plat? Your Honor, it is unclear when those words went on the plat. Well, when did the plat get introduced? When did people start looking at it? It appears that plat was introduced at some point during the negotiations prior to the enactment of the ordinance in 2010. As to when that language that hereby dedicated for road purposes, which doesn't even state who it's allegedly being dedicated to, was added, we simply don't know. And who owned the property? The owner of the property at that point was the Keystone Property Group, which I refer to in the briefs as the prior owners. My client, SF3, did not actually become owner of this property until after IDOT had initiated its quick take proceedings and had taken title to the language in our claims was allegedly dedicated. So it had no interaction, no discussions regarding this issue. It was the prior owners. And the names of the prior owners are on the documents that are in the record, as well as the persons that negotiated this on behalf of Naperville. IDOT had the opportunity to take discovery of these issues. They could have deposed these witnesses to clarify what is going on here, and they never chose to do so. They bore the burden of proof, and they never went so far as to show a clear convincing and unequivocal evidence that a common law dedication had, in fact, occurred. Has any other plat representing this development been filed? I am not aware of any, Your Honor. By your client, like put by your client? That's correct, Your Honor. My client has not filed or recorded any other plats. Okay. So anything and everything that has been done would have been done by Keystone or someone on their behalf. That is correct, Your Honor. So the prior owner of Keystone prepared the plat? To the best of our knowledge, Your Honor, it is unclear from the record who, in fact, prepared it. It certainly was not my client SF3. I understand that, but, I mean, we're talking about the dedication by not your client. Your client didn't dedicate anything. I understand that. It's whether it was done prior to that and accepted by the village. So the prior owner had some involvement in presenting this plat to the city, correct? That's correct, Your Honor. And the prior owner owned the land at the time, in 2010, the land that was hereby dedicated for road purposes, correct? That's correct, Your Honor. So why isn't that, as counsel argues, a clear intent to dedicate by using the legally binding words hereby dedicated for road purposes? Well, Your Honor, again, what we are looking at here is an unsigned, unrecorded plat of subdivision that contains in miniscule text the phrase hereby dedicated for road purposes. As Your Honor has indicated, there is no other reference to a dedication anywhere else in the record. And the fact that this plat was unrecorded and unsigned is not per se evidence of an intent to dedicate. IDOT claims this in their briefs. They essentially elevate it to the level of a properly reported statutory dedication. But as we discussed in our brief, the cases that IDOT cites in support for this are simply not on point. Seemingly aware of this, IDOT also claims that extrinsic evidence, in particular this ordinance that we've been discussing, evidence of some sort of bargain floor exchange between the parties. But again, as has been raised here, there is nothing on the face of that ordinance that references a dedication. There's nothing in these. Did IDOT seek to, in its eminent domain petition, seek to take that same land, the exact same property that was in there? That's correct, Your Honor, which then begs the question, if IDOT truly believed that there was a prior dedication here, why didn't it dismiss its case when it determined it was condemning more land than it was entitled to take in this action? It was taking more than it was entitled to take. So it was taking more land. That dedication was not all that they needed. If, in fact, that dedication had occurred, then the area of land that IDOT had sought to take in its complaint would have been incorrect because that land would either have been in its own possession at that point, or it would have been owned by another property. So when it filed a petition seeking to take land from the prior owner, it would have improperly set out the means and bounds of that alleged taking. Was there any IDOT negotiation during this process, to your knowledge, with Keystone and with Naperville? Did they ever get involved? To the best of my knowledge, there was no negotiation between IDOT and Keystone. IDOT was certainly in the background of this. It was on everybody's mind. For instance, in the staff memorandum that was submitted in connection with the ordinance, it states that Keystone was concerned about the upcoming taking of the property by IDOT. And that document certainly suggests that the purpose of this ordinance, the purpose of this file, was to address that upcoming taking of land by IDOT. And it was for that reason that the circuit court determined that while IDOT may have elicited some facts to support its position, there were certainly facts that spoke to the contrary. And under the law, that simply is not clear, convincing, and unequivocal evidence of a common law dedication. It was IDOT's burden to show that. That is correct, Your Honor. It was IDOT's burden to show that. And what's the standard of review? The standard of review, Your Honor, is abuse of discretion. And while IDOT claims that the standard of review is de novo review, there is simply no case specifically that speaks to this issue for the purposes of a prior indication that says the review is a de novo review standard. The inquiry here, what the court was tasked with at this juncture was to determine whether the threshold of evidence had been elicited to allow this issue to go forward. This is an evidentiary decision. And like the other evidentiary decisions that IDOT raises on appeal, these are all determined under the abuse of discretion standard. Moreover, the Boas case, which we cite to in our briefs, sets forth that the default standard of review whenever the domain matters is the abuse of discretion standard. So for all of these reasons, it's abuse of discretion that's the appropriate standard for review in this instance. What brings up the de novo, as I understood counsel, was the fact that we have this document that says hereby dedicated for road purposes. Those are all pretty identifiable terms, and they take on a little additional importance when you put the legal aspect on it. Dedicated means something. For road purposes might be a little out there, but I mean dedicated. If this was not contemplated as a dedication when this plan was at least formulated, why would lawyers use those words? Why would surveyors use those words? Why would everybody be talking about those words? I believe that's a placeholder for what was coming up with IDOT's taking. They refer to in the documents, for instance, future right-of-way taking, future right-of-way dedication for the Route 59 winding project. That's a lot longer than hereby dedicated for road purposes, I get it. But the point is this is supposed to mean something. If anybody picked that up, it should mean something. And what you're arguing here is it doesn't mean what it should mean. Your Honor, I would argue it would mean something if it was signed by the parties, if it was recorded and it was properly entered and was supported by the evidence that is extrinsic to that document. Certainly those words have meaning, but in this instance, the threshold, the iota of evidence to support that alleged dedication simply isn't there. The courts are very careful, given the extreme remedy that we're asking here, we're asking that an incomplete series of actions be construed as a giving up of property. And, therefore, the courts have held that if you're going to pursue that, you have to show that by clear, convincing, and unequivocal evidence. And that simply is not here, given all of the other deficiencies that we have been discussing today. All right. But this giving up of that, as you say, apparently falls on the shoulders of Keystone and now your clients who obviously have this property in development pursuant to what we could see on paper. And according to counsel, there has been a request to do your part, get this signed, get it on, get it a record. Has that happened? It has not happened, Your Honor. And it's interesting that this issue regarding the Naperville Coach, to the best of my knowledge, was raised for the first time in the reply brief. And I believe in the facts of the original briefs in this case, there's a statement in the ordinance itself that it was the duty of the recorder to record this plat of subdivision. And, moreover, I got a December 2015 letter to my clients, which was, again, submitted after the eminent domain action was begun in this case, after IDOT filed its motion seeking a prior dedication in this case, was quite frankly ineffective because at that point, for over two years, IDOT already had title to that property, took that property in quick take. My client, SF3, never had title to any of this property that IDOT alleges is dedicated. And so to the extent that Naperville was asking us to effectuate a dedication that we never even prepared, there was no showing that Naperville even had the power to do so, given the fact that this land had already been taken by IDOT. Naperville's concern was not with my client. Its concern was with IDOT itself, and it should have resolved that issue with IDOT. Your Honor, I have only one other issue I'd like to address during arguments, and that's the standard of review for the proposed non-pattern jury instruction as to the issue of mitigation. The correct standard, Your Honor, is the abuse of discretion standard. The IDOT simply misconstrues the Mikolajczyk case, which is the controlling authority on review on this issue. In the Mikolajczyk case, the Supreme Court had to deal with two separate issues. One was whether a offered pattern instruction that actually went before the jury accurately stated the law. The second question was whether a non-pattern jury instruction that was refused by the court, in fact, should have been presented to the jury. And the Supreme Court held that for that first issue, the proper standard of review was the de novo standard. But the second issue, whether or not the refused jury instruction should have been presented, was, in fact, reviewed by the de novo standard. And to be clear, there is no other jury instructions that went before the jury in this case. IDOT is not claiming none of them inaccurately stated the law. Its sole claim is to the issue of the refused non-pattern jury instruction. And it's our position. IDOT claims that we do not present this sort of tack-on instruction to the issue of damages, that the idea of mitigation will be failed to have been brought to the attention of the jury. And our point is that the instructions as a whole accurately set forth the relevant elements of damages that the jury should have considered. Did it include mitigation? Your Honor, the element of mitigation is certainly something that needs to be considered, and the jury instructions consider that. But the controlling law in Illinois and the concern in Illinois is to make sure that it's properly emphasized before the jury. The jury instructions, the pattern jury instructions, for instance, devote an entire section to this issue, 300.40 through 300.50, where they state that specific elements of damage should not have specific instructions presented to the jury. By way of one example, there's the instruction with respect to comparable sales of 300.40. And the committee, in the comments to that instruction, states, and I quote, an instruction on this subject would single out a portion of the evidence, thus giving an improper emphasis. Instructions which emphasize particular items of emphasis in condemnation cases are properly refused, end quote. And the committee then goes on to cite two Supreme Court cases that support that issue. Similarly, with respect to the issue of mitigation here, IDOT, in their opening brief, cites to this Department of Transportation v. Jones case. And the specific page which IDOT cites to, page 596 of that case, the court states that, and I quote, costs of repair, replacement, or reproduction necessitated by taking an improvement, however, are no different than other elements of damage with respect to their evidentiary value in a condemnation proceeding. End quote. And this was at 596 in that case. What this stands for is the idea that it was not an error by the circuit court to refuse this non-pattern jury instruction. In fact, had it offered it to the jury, it would have committed a reversible error, because it would have emphasized a specific element of damages and would have confused and misled the jury as to how it should have appropriately treated the various elements of damage. So the instructions that were the pattern instructions which the committee had set forth were appropriate, were, in fact, the means and bounds of the damages issue that should have been presented to the jury in which they, in fact, considered. Your Honors, I have no additional questions at this time. Let me respectfully, I have no different additional arguments at this time. I respectfully request that the jury word be affirmed and thank the court for the opportunity to address these issues at oral arguments. If you have any additional questions for me, I'd be happy to answer them at this time. Thank you, Counsel. Thank you, Your Honors. Ms. Pritchard. Do you have any basic disagreement with counsel that evidentiary type issues are abusive discretion standard? No. I believe that evidentiary issues can be and mostly are abusive discretion standards. So why do we have different issues? Why are you saying, say, in the first argument that it's de novo, why are you also saying that the jury instruction, which is whether to introduce or not to introduce, is de novo as opposed to abuse? Well, when I say evidentiary issues, I mean when there are actual factual issues such as testimony and credibility. With respect to the dedication, the determination can be made from undisputed documentary documents and a record, and none of those documents were disputed before the circuit court or even here on appeal. And I believe that issue can be determined from those documents, and there's no credibility or other issues that would require the court's discretion. With respect to the jury instruction, the law is, that we cite, that when the question is whether or not the circuit court properly instructed as to the applicable law, then that is an issue of law for the court. And in this case, the circuit court took the position that there is no duty to mitigate in condemnation, and we believe that was error, and that was errors about our law, and that would be under the appellate court and Supreme Court decisions in the Quincy Cotell's case. We believe that the circuit court failed to give that instruction, we think, as de novo, and that would be under what we cite as the Barth v. State Farm case on page 44 of our brief. The circuit court refused Ida's instruction, which was a pattern instruction, 33.02, that it is on the duty to mitigate when there's a claim for damages. And that was a pattern instruction that Ida offered and the court refused. And one of the court's reasonings was that there was no duty to mitigate and that it did not need to use that instruction because there was no mitigation instruction in the eminent domain pattern instructions. We believe that was error because the eminent domain pattern instructions do not limit the applicable law in an eminent domain case. And as the Supreme Court said in the Kelly v. Chicago Park District case, which was quoted by the appellate court in Quincy Cotell's house, mitigation applies to any claim, virtually every claim of damages. And a claim for damages in eminent domain is no different than a claim for damages in any case of law. Is the failure to mitigate damages a specific element of damages to be considered by the jury? No, Your Honor. In fact, the instruction that we offered, which was, well, the instruction we'd offered, we just revised a few words, but Illinois 33.02, pattern instruction, mitigation of damages, just doesn't require the jury to make any determination on specific amounts. It just says, in fixing the amount of money, which will reasonably and fairly compensate, what we said was the defendant in this case, you are to consider the person whose property is damaged must exercise ordinary care to minimize existing damages and to prevent further damage. Damages approximately caused by failure to exercise such care cannot be recovered. So that's an element that a jury should consider in determining the total amount of damages. We believe the jury should be instructed that there is a duty to mitigate and that damages that can be cured should not be recovered, because if they are, then that can allow for a windfall, which is what we believe happened in this case. My question is kind of a specific question. That is, is that a specific element that the jury is to consider in damages? I mean, whether the amount that should have been mitigated, you have damages, you have all these different damages that are testified to, and the jury has to sit down and figure out which ones it's going to apply. And you have a number of different elements of damages, and then the domain case is one of them, the mitigation, and whether, to what extent it wasn't mitigated. Well, when the jury is evaluating the appraiser's testimony, I believe the jury is also evaluating the various damages that are espoused by the various appraisers, and they're going to, you know, take some into account and discount some damages. So to that extent, they might find that some damages claimed, for instance, by one of SO3's appraisers could in fact be cured, and maybe they're not going to attribute as much weight to that damage or they don't feel like that damage should be compensated for. Correct. So that would be an element that they would consider. Yes. Now, counsel quoted the committee comments that said that you're not supposed to emphasize a specific element of damages in the number of domain cases. Your Honor, the case law, and this would be Eastlake, Jones, and Gottman for this point, page 37 of our brief, is that in condemnation, the cost to remediate the property or cure the damages are referred to generally as cost of cure. And most times, both sides present evidence of cost of cure, what does it take to minimize or reduce the impacts from the taking. The cost of cure can be testified, can come into evidence. They just cannot be separately recoverable. But they are part of the evidence that's evaluated. What were the costs of cure in this case? The specific dollar amounts can come into evidence as well, but they cannot be specifically recovered as damages. The damages are the difference between the, it's a diminution in the remainder's value after the taking and as affected by the project. The cost of cure can be taken into account. And Jones and Gottman instructed that when the damages to the remainder can be reduced and the mitigation is not speculative, then the cost of reducing the damages should be considered in determining just compensation. And the reason for this is because otherwise you have the risk of the property owner receiving a windfall because the property owner at trial could claim full extent of damages, receive those damages, and after the case is over, mitigate those damages, in which case they will have received compensation for damages that never would occur. And this is what's prohibited under the Department of Transportation versus Greenlee, which we cite at page 37. And we believe this is what happened in this case. In fact, Patricia McGar, SSB's appraiser, testified that while she valued the remainders, if the hypothetical property owner would take no actions to reduce the damages, but she admitted that her damages would go down if new signs could go on the property, and she admitted that the 25-foot high sign that stood at the corner that she felt substantially damaged the property could be replaced with additional signs and her damages would go down. And she also admitted that she agreed SF3 would probably put new signs up after the case was over because that only made sense, which brings me to the discovery violation. Okay. But now let's right there. She testified to those things. The jury heard those things. But the point is the pattern jury instruction takes those things into account without saying look at this particularly. So why isn't that adequate? Right. The reason that was not adequate in this case is because while she testified she did not mitigate, Ida was precluded from arguing to the jury that she had a duty to mitigate, and the jury should consider that her opinion was improper because she did mitigate, and the jury should also understand that it could discount the damages that could be mitigated. So without the instruction, Ida couldn't argue that her opinion was improper, and it was improper because it provided for damages that could be mitigated by putting new signs and new landscaping on the property. Without that instruction, the ability to cross-examine McGarrett on the fact that she didn't mitigate carried little weight, and the jury was not advised that that was a responsibility that she had that she didn't follow. All right. Well, your time is up, counsel. If you have just one more item that you want to summarize, you may. Otherwise, we need to move on to another case. Thank you. In conclusion, the circuit court's failure to find a dedication improperly and substantially increased the range of evaluation evidence heard by the jury by more than $300,000, which allowed ESSA 3 to profit and receive a windfall from the failure of the prior owners to fulfill their legal obligation and report the plaque. The circuit court's errors in allowing McGarrett to testify for her damages that did not mitigate and rewarding ESSA 3 for its discovery violations and refusing to instruct the jury on the duty to mitigate also improperly inflated the evaluation evidence because she had the highest damages opinion at trial, and this allowed ESSA 3 to receive a windfall by being compensated for damages that would never occur. Each of the circuit court's errors resulted in the jury hearing improper and incompetent evidence of just compensation and undoubtedly influenced the jury's award. Each of these errors, any of these errors require a new trial, but certainly the people who affected these errors affected the award and deprived Ida of a fair trial. We therefore ask this court to reverse the judgment of the circuit court and remand this case. Thank you. Thank you. Thank you, counsel, for arguing this morning. We will issue a written opinion in due course, and we will stand in a brief recess now.